RENDERED:  MARCH 27, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0858-ME


J.A.D.                                                                                    APPELLANT


|  | APPEAL FROM ROCKCASTLE CIRCUIT COURT |
|---|---|
| v. | HONORABLE MARCUS L. VANOVER, JUDGE |
|  | ACTION NO. 24-AD-00022 |


COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND
FAMILY SERVICES; J.B.; AND
M.M.D., A MINOR CHILD                                               APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; CALDWELL AND A. JONES,
JUDGES.

CALDWELL, JUDGE:  This appeal is taken from the Rockcastle Family Court's

findings of fact, conclusions of law, and judgment terminating parental rights of

J.A.D. ("Mother") to her minor child ("Child").[1]  Appointed counsel for Mother

filed an *Anders*[2] brief in accordance with *A.C. v. Cabinet for Health and Family*

*Services*, 362 S.W.3d 361 (Ky. App. 2012), conceding that no meritorious

assignment of error exists for appeal, requesting to withdraw as counsel, and

providing Mother with the opportunity to file a *pro se* brief.  No *pro se* brief has

been filed, and counsel's motion to withdraw is granted by separate order.  After

independently examining the record and the law, we find no error and affirm the

Rockcastle Family Court's order terminating Mother's parental rights.

**FACTS AND PROCEDURAL HISTORY**

Mother gave birth to Child on September 19, 2022.[3]  Both Mother and

Child tested positive for illicit substances, and Mother admitted to using

methamphetamine during the pregnancy.  The Cabinet for Health and Family

Services ("Cabinet") became involved on September 20, 2022, after receiving a

referral and developed a prevention plan, conditioned on Mother's sobriety, to

---

[1] To protect the privacy of the minor child and pursuant to court policy, we do not refer to the minor child or her natural parents by name.  *See* Kentucky Rule of Appellate Procedure (RAP) 5(B)(2).

[2] *Anders v. California*, 386 U.S. 738 (1967).

[3] Mother initially named J.M. as Child's father, but subsequent DNA testing excluded J.M. as a biological parent.  Mother later identified J.B. as the putative father, and J.B. was served with the termination of parental rights petition via Warning Order Attorney on or about February 11, 2025.  Despite numerous efforts to contact and/or locate J.B., no response was received and his whereabouts remained unknown.  The family court terminated the parental rights of both Mother and J.B., but only Mother appealed that decision.  Accordingly, we limit our discussion and review of the family court's order as it pertains to the termination of Mother's parental rights.

allow Child to remain in her custody. Upon receipt of medical records reflecting Child's positive drug screen for methamphetamines and amphetamines at birth, the Cabinet filed a dependency, neglect, or abuse ("DNA") petition on December 21, 2022, with the Rockcastle Family Court.

The family court held a temporary removal hearing on December 27, 2022, and ordered Child to remain in Mother's custody. Thereafter, the Cabinet developed a case plan with Mother, which required her to maintain stable housing and employment; complete evaluations for substance abuse, mental health, and parenting and follow all recommendations; comply with daily call-ins for drug screens and submit for testing as requested; and cooperate with the Cabinet.

The family court held an adjudication hearing on May 2, 2023, at which Mother stipulated to neglect. Unfortunately, by that time, Mother had fallen out of compliance with her case plan, raising concerns over her sobriety while in a caretaking role. The family court granted the Cabinet temporary custody of Child, and the Cabinet placed Child with her maternal grandmother ("T.D."). However. this placement lasted only a few days. Due to complications with T.D.'s health and work schedule and the unavailability of other appropriate relatives, the Cabinet removed Child to a foster home on or about May 5, 2023, where she resided for the remainder of the case.

At the disposition hearing on May 30, 2023, the family court ordered Child committed to the Cabinet's custody, and Mother began another case plan reinstating original goals such as obtaining evaluations, following through with recommendations, and complying with drug screening procedures. The Cabinet referred Mother to mental health counseling services and provided financial assistance for costs associated with the various assessments and drug testing.

Following the disposition hearing, Mother made significant progress with her case plan. This progress resulted in increased and extended visitation, including overnight visits, and the supervision restriction on visits was lifted in September 2023. By November 2023, however, concerns arose again over Mother's sobriety due to her noncompliance with calling the drug-screening hotline and submitting for testing. On November 6, Mother admitted to recent methamphetamine use, and subsequent lab testing confirmed positive drug screens for methamphetamine, amphetamine, and THC. The Cabinet required Mother to restart her case plan and returned her to supervised visitation without overnight visits.

By the end of November 2023, Mother provided a negative drug screen but then failed to submit for drug testing for the next four months. In January 2024, Mother enrolled in medication-assisted treatment but did not complete it; instead, she reported opting to address her substance-abuse issues on

her own.  Mother eventually admitted to relapsing in February.  In April 2024, she resumed drug testing, passing several tests, but missed the entire month of May.

On May 13, 2024, the Cabinet filed a petition for involuntary termination of parental rights, alleging two grounds of parental unfitness:  (1) that Mother continuously or repeatedly failed to provide essential parental care and protection for Child and there was no reasonable expectation of improvement in this regard considering Child's age; and (2) that Mother, for reasons other than poverty alone, continuously or repeatedly failed to provide or was incapable of providing necessities, such as food, clothing, shelter, medical care, or education, and there was no reasonable expectation of significant improvement in her conduct in the immediately foreseeable future given Child's age.  The Cabinet also noted Child's continued placement in foster care since May 2023.  Despite the Cabinet's efforts to assist Mother with rehabilitation and family reunification, Mother declined to take advantage of those resources.  The Cabinet maintained it was in Child's best interest for Mother's parental rights to be terminated.

The family court appointed counsel to represent Mother in the termination action, and the case proceeded to a final evidentiary hearing on May 16, 2025.  The Cabinet presented the testimony from two social workers:  Destiny Gamble, the ongoing supervisor assigned to Mother's case beginning in January 2023, and Brianna Bowling, the ongoing case worker assigned to Mother's case

beginning in November 2024. Mother called T.D. to testify and testified on her own behalf. In early June 2025, the family court entered an order terminating Mother's parental rights along with supporting findings of fact and conclusions of law. Mother filed a timely notice of appeal. Further facts will be provided as necessary in our analysis.

## ANALYSIS

Mother's appointed counsel filed an *Anders* brief in compliance with *A.C.*, 362 S.W.3d 361. In *A.C.*, this Court adopted and applied the procedures identified in *Anders*, 386 U.S. 738, regarding appeals from orders terminating parental rights where counsel cannot identify any nonfrivolous grounds to appeal. *A.C.*, 362 S.W.3d at 371. Those procedures require counsel to first engage in a thorough and good faith review of the record. *Id.* "[I]f counsel finds his [client's] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw." *Id.* at 364 (quoting *Anders*, 386 U.S. at 744).

Mother's appointed counsel complied with the requirements of *A.C.* and *Anders* by providing Mother with a copy of the brief and informing her of her right to file a *pro se* brief raising any issues she found meritorious. *A.C.*, 362 S.W.3d at 371. Mother has not filed a *pro se* brief. Per *A.C.*, we have closely examined the record and the law and agree with counsel that no grounds exist that

would warrant reversing the family court's order terminating Mother's parental rights.

The applicable standard of appellate review of findings by the family court in a termination of parental rights case is the clearly erroneous standard; therefore, the findings of fact will not be set aside unless unsupported by substantial evidence. *M.L.C. v. Cabinet for Health & Fam. Servs.*, 411 S.W.3d 761, 765 (Ky. App. 2013); CR[4] 52.01. A family court has broad discretion in determining whether the best interests of the child warrant termination of parental rights. *C.J.M. v. Cabinet for Health & Fam. Servs.*, 389 S.W.3d 155, 160 (Ky. App. 2012).

Kentucky Revised Statute (KRS) 625.090 sets forth the requirements that must be met before a family court may involuntarily terminate parental rights. First, the family court must determine whether the child is abused or neglected or whether the child was previously determined to be abused or neglected by a court of competent jurisdiction. KRS 625.090(1)(a). Second, the family court must find that the termination of parental rights would be in the child's best interest. KRS 625.090(1)(c). Third, the family court must find the existence of one or more of the eleven grounds set forth in KRS 625.090(2)(a)-(k). When determining the best interest of the child and the existence of a ground for termination, the court must

---

[4] Kentucky Rules of Civil Procedure.

consider the list of factors provided in KRS 625.090(3). Finally, the findings required by KRS 625.090(1)-(2) must be established by clear and convincing evidence.

In the matter before us, each of the statutory requirements were met; the family court made the findings required in KRS 625.090 by clear and convincing evidence, specifically including determinations that (1) Child was neglected, (2) termination of parental rights was in Child's best interest, and (3) at least one ground of parental unfitness existed. Based on our review of the record, substantial evidence supports the family court's factual findings on these matters. *See M.L.C.*, 411 S.W.3d at 765 (quoting *M.P.S. v. Cabinet for Human Res.*, 979 S.W.2d 114, 116 (Ky. App. 1998)). The family court also appropriately considered the factors listed in KRS 625.090(3) in making those required findings.

Under the first element, KRS 625.090(1), the court found that Child was previously adjudged to be a neglected child in the preceding DNA action before the Rockcastle Family Court, and in fact, the record reflects Mother's stipulation to neglect. Moreover, the family court made an independent finding of neglect under KRS 600.020(1) by clear and convincing evidence based on the following: (1) Mother continuously or repeatedly failed or refused to provide essential parental care and protection to Child given Child's age; and (2) despite making some progress toward her court-approved case plan goals, Mother's

"consistent pattern of relapses" impeded the Cabinet's efforts toward reunifying Child with Mother.

The family court noted that during the two plus years of Cabinet involvement, the Cabinet provided case plans and recommended services for Mother. While Mother completed various evaluations and remained in contact with her Cabinet workers, she was unsuccessful at following through with recommendations. For instance, Mother qualified for inpatient rehabilitation, an option that case workers repeatedly discussed with her, but Mother stated she was not interested. When confronted with missed or failed drug screens, Mother accepted responsibility, but by the same token, delayed enrolling in treatment and continued to be noncompliant with ongoing drug-screening requirements. After a relapse in October 2024, Mother waited until January 2025 to enroll in an intensive outpatient program ("IOP"). Mother completed IOP in April 2025, although testimony from Ms. Bowling revealed that Mother misrepresented the length of her sobriety to IOP providers and continued to use while in IOP. The court also took note of Ms. Bowling's testimony that Mother relapsed approximately 11 times since January 2023. Not included in that number was an instance in March 2025 when Mother tested positive for alcohol consumption and admitted to drinking a margarita to celebrate her sobriety.

Substantial evidence supports the family court's findings that Child had been previously adjudicated neglected and remained neglected based on Mother's lack of satisfactory compliance with case plan requirements. Thus, the findings were not clearly erroneous. We next address the court's findings regarding Child's best interest.

Under the second element, the family court considered the factors described in KRS 625.090(3) and found termination of parental rights to be in Child's best interest. The court found that the Cabinet made reasonable efforts toward reunification with Mother, but those efforts were unsuccessful. Moreover, the court held the Cabinet "offered or provided all reasonable services to the family, including case planning, referrals to community partners, and supervised visitation." Yet, as the court observed, Mother "failed, refused or has been unable to make sufficient efforts and adjustments in [her] circumstances, conduct or conditions to make it in the child's best interest to return . . . to [her] home[] within a reasonable period of time, considering the age of the child."

Our review of the record indicates the evidence did not support a finding to the contrary. After more than two years, Mother continued to struggle with housing instability, mental health, and substance abuse. At the termination hearing, Mother emphasized her recent employment at Taco Bell and return to live with her mother, T.D. However, Mother also acknowledged that she and her

mother can have a volatile relationship and cannot be in close quarters for extended periods without bickering and fighting. To that end, Ms. Bowling's testimony revealed concerns over physical altercations with T.D. and T.D.'s partner, including an incident necessitating a welfare check on Mother after she was kicked out of T.D.'s house and made suicidal threats.

Moreover, when Mother was not allowed to stay with T.D., she declined Cabinet recommendations to seek placement at inpatient rehab, sober living, or a halfway house, instead opting to live with friends or in a tent. In November 2024, after a recent eviction, the Cabinet referred Mother to local housing authorities, such as Daniel Boone Community Action Agency, Inc., but Mother waited to contact them until April 2025 – a month before the termination hearing. Mother was still on waiting lists at the time of the hearing.

Evidence from the termination hearing further established that the delay to seek housing was not the only instance of Mother's lack of forethought and failure to exercise good judgment. Despite numerous directives from the Cabinet, Mother did not reengage with mental health counseling until mid-January 2025 and declined gene site testing and other psychiatric services as she did not want to take medication. Mother acknowledged hanging out with bad influences, yet insisted she would stop once Child returned home. Mother missed a recent drug screen in March 2025, because she went on a road trip with her cousin. Of

particular concern, a few weeks before the termination hearing, Mother was injured when she was at a friend's trailer and put out a cigarette in a cup supposedly containing gunpowder, which caused an explosion. Nevertheless, Mother maintained that these behaviors would stop once Child was placed back in her care and pleaded for another chance.

Regarding Child, she was placed with the Cabinet in May 2023 and entered foster care at eight months old. Child remained with the same foster family for two years, and by the time of the termination hearing, that foster home had become an adoptive placement. The family court noted Child's bond with the foster family and found Child's medical needs were met. The court believed Child would "continue to thrive in a permanent adoptive placement." By her own testimony, Mother applauded the foster family's efforts in raising Child.

Based on our review of the record, we conclude the family court's factual findings about best interest factors are supported by substantial evidence. Moreover, we discern no abuse of discretion in its finding termination of Mother's parental rights to be in Child's best interest.

Lastly, the family court found two grounds existed for termination of parental rights under KRS 625.090(2). First, the court held that Mother, "for a period of not less than six months, ha[s] failed or refused to provide or ha[s] been substantially incapable of providing essential parental care and protection for the

-12-

child, and there [was] no reasonable expectation of improvement in parental care and protection, considering the age of the child." *See* KRS 625.090(2)(e). Regarding the second ground for termination, the court found that Mother "failed to provide or [is] incapable of providing essential food, clothing, shelter, medical care, or education reasonably necessary and available for the well-being of the child, and there is no reasonable expectation of significant improvement in the parent['s] conduct in the immediately foreseeable future, considering the age of the child." *See* KRS 625.090(2)(g).

A court needs to find the existence of only one ground under KRS 625.090(2). The evidence produced at the hearing did not indicate that Mother would obtain the stability necessary for the safe return of Child to her care, considering Child's age. In her statement to the court, Mother acknowledged her shortcomings, the numerous chances she had been given, and how much of Child's life she had missed. The family court did not err by declining to give Mother another chance. The expectation of parental improvement is to be viewed in consideration of the child's age and, as this Court has found, "more significant and quicker progress must be demonstrated when younger children are the subject of the termination of parental rights." *M.E.C. v. Commonwealth, Cabinet for Health & Fam. Servs.*, 254 S.W.3d 846, 855 (Ky. App. 2008). Accordingly, the family

court's finding of at least one ground of parental unfitness was supported by clear and convincing evidence.

## CONCLUSION

The family court's findings are supported by substantial evidence, and all statutory requirements for involuntary termination of parental rights were met. No nonfrivolous grounds for appeal are found in the record. For these reasons, and with due regard to the serious consequences of involuntary termination, we find no error and AFFIRM the judgment on appeal.


ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Maryann Zoll                            Leslie M. Laupp
Lancaster, Kentucky                     Covington, Kentucky